UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-81163-Civ-MARRA/HOPKINS

PETER COPPOLA,

        Plaintiff,

v.

CASARO LABS, LTD.,
SAMUEL LUBLINER,
RODNEY VICCARI, and,
STANCE BEAUTY LABS, LLC,

        Defendants.
_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT (DE 44)

**THIS CAUSE** is before this Court upon an Order Referring Defendants' Motion to Enforce Settlement Agreement (DE 44) to the undersigned United States Magistrate Judge for appropriate disposition[1] (DE 47). Pursuant to Defendants' request for an expedited disposition (DE 44), the undersigned ordered expedited briefing (DE 48). Plaintiff subsequently filed a Response (DE 49) and supplemental Response (DE 51), and Defendants filed a Reply (DE 52). The undersigned held an evidentiary hearing on Plaintiff's Motion on April 17, 2014 (DE 56). This matter is now ripe for this Court's review.

For the reasons that follow, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Enforce Settlement Agreement (DE 44).

---

[1] Federal District Courts have jurisdiction to enforce settlement agreements when one party refuses to abide by the agreement prior to dismissal. *See Kent v. Baker, III*, 815 F.2d 1365, 1398 (11th Cir. 1987).

## **BACKGROUND**

In October 2008, Plaintiff Peter Coppola and Defendant Casaro Labs, LTD., entered into a licensing agreement whereby Casaro Labs was authorized to manufacture and sell Peter Coppola hair care products for five years (DE 44). Plaintiff terminated that licensing agreement on July 1, 2012, following a trademark dispute (DE 49). In October 2012, Plaintiff initiated the instant action asserting claims of breach of license agreement, trademark infringement, unfair competition, and accounting against four interrelated Defendants (collectively "Defendants") (DE 44).

Incidental to the instant suit, on an unknown date, Plaintiff formed Beauty Investors Group, LLC, with at least one other member (DE 55). In 2013, either on or prior to May 30,[2] Beauty Investors Group, LLC, entered into a limited liability company agreement ("LLC Agreement") with another entity known as The Davidson Group, LLC (DE 55). The newly formed limited liability company is known as Peter Coppola Beauty, LLC (DE 55). On May 30, 2013, Plaintiff entered into an Intellectual Property Purchase Agreement ("IP Agreement") with Peter Coppola Beauty, LLC, whereby Plaintiff agreed to sell the LLC his rights in the Peter Coppola trademark (DE 55). Although the IP agreement acknowledges Plaintiff's pending lawsuit (DE 55, p. 27), at no point did any of the individuals or entities involved in the above-mentioned companies seek to participate in the litigation. Furthermore, despite Defendants attempts to discover any agreements which might have bound Plaintiff's authority or limited a

---

[2] The LLC Agreement does not indicate on which date in 2013 the Agreement was signed, although the Agreement specifies an effective date of January 25, 2013 (DE 55). Because the IP Agreement was signed on May 30, 2013, and one of the parties to the IP agreement was the newly formed LLC, the LLC was necessarily in existence by that time. Although the undersigned sought additional testimony on this issue at the hearing, no party was able to determine the exact formation date of the LLC (DE 56).

potential agreement in the case,[3] Plaintiff failed to produce either the LLC or IP Agreement until the day before the discovery hearing (DE 54, 55, 56).

Pursuant to a Court Order (DE 17), the Parties participated in mediation on January 20, 2014 (DE 44). Mediation resulted in an impasse (DE 44). Nevertheless, the Parties continued negotiations, evidenced by frequent and detailed email communications (DE 52). On March 5, 2014, Plaintiff sent Defendants a counteroffer, which read, in part:

> After conferring with [Plaintiff], he is willing to reduce the 300K to 275K if it is paid with 5 days of signing. Otherwise he is not willing to accept 200k now and 50k with four months. That is the only part of your clients counter which was not acceptable.

(DE 52-9). Defendants contend that thereafter, on March 6, 2014, Defendants' counsel, Vanessa Serrano, called Plaintiff "to accept those terms with minor adjustment—$250,000 would be paid 5 days after the execution of collateral documents further memorializing the settlement terms and $25,000 would be paid 120 days later" (DE 44). To memorialize the telephone conversation, Defendants sent Plaintiff an email on that same date ("March 6th email") stating the following:

> As discussed, the settlement will be for $250,000 payable 5 days after signing the documents and $25,000 120 days later. The royalty will be 7% and the agreement will run 16 months. The agreement will specify that all products being sold by Casaro (including those Plaintiff contends are outside of the scope) are acceptable (i.e., hair brushes, thermal pouches, etc.) and that the geographic scope remains the same with the exception of TJK-TJ Maxx European division. Our clients will withdraw the TM application and will waive their claim for the 4% fee. All

---

[3] Defendants specifically sought this information by way of a Request for Production and Plaintiff's Deposition. In their Second Request for Production, Defendants requested contracts, agreements, and documents reflecting a license to any third party or similar documents, but were informed that Plaintiff possessed "no documents responsive" to these requests (DE 52). Furthermore, during his deposition on August 21, 2013, Plaintiff testified that he did not believe Peter Coppola Beauty, LLC, had been formed and that he did not believe that the operating agreement had been finalized (DE 56). When questioned at the evidentiary hearing about his prior testimony, Plaintiff testified that the reason he indicated during his deposition that the LLC had not been formed and the related Agreements had not been signed was that he forgot (DE 56).

parties will agree to a full mutual release (excluding the "new" license agreement).

Please confirm we have a deal.

(DE 44-2). Eight minutes later, Plaintiff's attorney, Ronald D'Anna, emailed a one-word response: "Agreed" (DE 44-3).

A week later, on March 13, Defendants emailed Plaintiff a draft license agreement (DE 44-4). Plaintiff did not respond, so Defendants sent an additional email on March 19, this time including a draft settlement agreement and a mutual general release, in addition to the draft license agreement that was previously sent (DE 44-5). On March 21, Plaintiff emailed Defendants stating:

> In order to accommodate the varying interests of [Plaintiff] and his partners the settlement needs to be restructured as follows; (1) the settlement amount needs to be increased from $275,000 to $. 350,000. Same up front payment of $250,000 with the balance paid four months thereafter; (2) the royalty will be decreased to 6%. All the remaining terms to be the same. In light of the lack of trust as to the accuracy of [Defendants'] sales, the license agreement must focus of transparency and detailed sales verification mechanisms and penalties and termination remedies if [Defendants] fudge[] on the numbers.

(DE 44-6). Defendants refused to "restructure" the prior agreement and filed the instant Motion to Enforce Settlement (DE 44). Therein, Defendants contend that the Parties reached an enforceable settlement agreement of this case under the terms of the March 6th email (DE 44).

In Response to Defendants' Motion, Plaintiff makes two arguments worthy of discussion. First, Plaintiff alleges that the settlement is not enforceable because the agreement did not contain all material terms (DE 49). Specifically, Plaintiff contends that the settlement agreement did not contain the essential terms concerning enforcement of the license agreement (DE 49). Second, Plaintiff contends that the alleged settlement agreement is invalid because of a lack of

authority (DE 49). Plaintiff asserts that his attorney, Mr. D'Anna, did not have authority to enter into a settlement agreement, and furthermore, Plaintiff himself lacked the proper authority to enter into a settlement or renewed licensing agreement based on the LLC and IP agreements to which he was bound (DE 49). In his supplemental Response, Plaintiff asserts that the settlement agreement is invalid because the part of the settlement agreement concerning a renewed licensing agreement does not comply with the statute of frauds (DE 51).

At the evidentiary hearing on April 17, Defendants presented evidence concerning the negotiations that led up the March 6th email, including a variety of email communications that were attached to either their Motion or Plaintiff's Response (DE 56). Also by way of these emails, Defendants presented evidence concerning both Plaintiff's and Mr. D'Anna's authority to settle the case (DE 56). As counter-evidence on the issue of authority, Mr. D'Anna solicited the testimony of Plaintiff Peter Coppola and non-party Yosef Davidson[4] (DE 56). Notably, Plaintiff testified that he believed he had full and complete authority to settle the lawsuit throughout the period of negotiations, despite the fact that he had personally signed both the LLC agreement and IP agreement that now allegedly bind him (DE 56).

## DISCUSSION

To determine whether an enforceable settlement agreement exists in this case, the Court must determine two legal questions: first, whether the attorney had "clear and unequivocal authority" to enter into a binding agreement on behalf of his client, and second, whether a binding agreement was reached. *See Vital Pharmaceuticals, Inc. v. S.A.N. Nutrition Corp.*, 2007

---

[4] Mr. Davidson is the son of Karen Davidson, who is one of the members of the Davidson Group, LLC. Over Defendants' objections, Mr. Davidson testified regarding the LLC Agreement and the IP Agreement, as well as his representations to Defendants prior to the March 6th email (DE 56).

WL 1655421, *4 (S.D. Fla. June 6, 2007). Both questions, discussed in turn below, will be analyzed in accordance with Florida law. *See id.* at *5 ("State law governs the construction of a settlement agreement and the attorney's authority to enter into a settlement agreement on behalf of his client.").

**Authority to Enter into Binding Settlement Agreement**

Plaintiff primarily asserts that Mr. D'Anna did not have authority to enter into a binding settlement agreement in this case. As the parties seeking to enforce that agreement, Defendants have the burden to show that Plaintiff's counsel had "clear and unequivocal authority to enter into the settlement agreement." *See Vital Pharmaceuticals,* 2007 WL 1655421 at *5 (citing *Murchison v. Grand Cypress Hotel Corp.,* 13 F.3d 1483, 1485 (11th Cir. 1994)) ("Under Florida law, the party seeking to enforce the settlement agreement must demonstrate that the other party's counsel had 'clear and unequivocal authority to enter into the settlement agreement.'"). Some of the relevant facts which could evidence clear and unequivocal authority include the extent to which a client is actively involved in settlement negotiations, and testimony concerning authority. *See id.*

To meet their burden in this case, Defendants attached a number of emails sent between the Parties throughout the negotiations (DE 52). A review of these emails and the testimony solicited at the hearing shows that Defendants have indeed met their burden. For example, Defendants attached emails that were composed and sent by Plaintiff's attorney, Mr. D'Anna, which state as follows:

> Please let your clients know that [Plaintiff] has vested in me, the only attorney of record in this lawsuit, with the sole authority to deal with all issues in the pending lawsuit, including settlement matters.

(DE 52-1); and

I have had to endure a great deal of vitriol to obtain authority for the counteroffer.

(DE 52-4). Additionally, numerous other emails indicate that Mr. D'Anna was in constant communication with Plaintiff, was running each offer and counteroffer by him, and that Plaintiff was actively engaged in the settlement discussions (DE 52-2, 52-5, 52-7, 52-8, 52-9, 52-10, and 52-11). Furthermore, according to his own testimony at the evidentiary hearing, Plaintiff admitted that he gave Mr. D'Anna full authority to settle the case (DE 56).

Ostensibly in light of this overwhelming evidence of clear and unequivocal authority, Plaintiff sought to alter the authority issue by asserting that he himself did not have authority to settle this case. Instead, Plaintiff asserts that under the LLC and IP Agreements described above, any settlement had to be approved not only by Plaintiff, but also by his two business partners (DE 49, p. 9). Notably, Plaintiff has failed to cite any case law which supports his position.

As mentioned above, none of the parties to the other agreements sought to intervene in this case. Accordingly, the undersigned finds that Plaintiff himself had authority to settle this case, that he clearly and unequivocally bestowed that authority on his attorney, and that any disputes between Plaintiff and his partners are irrelevant to the disposition of Defendants' Motion to Enforce.

**Enforceability of Settlement Agreement**

In another attempt to be relieved from enforcement of the settlement agreement, Plaintiff asserts that no binding agreement was reached because the March 6th email did not contain all of the material terms that would be necessary to settle the case.

"Basic contract law applies to determine whether a settlement agreement is enforceable, and in Florida, the objective test is used to determine whether such a contract is enforceable." *See Vital Pharmaceuticals,* 2007 WL 1655421 at *6 (citing *Robbie v. Miami,* 469 So. 2d 1384, 1385 (Fla. 1985); *Gaines v. Nortrust Realty Management, Inc.,* 422 So. 2d 1037 (Fla. 3d DCA 1982)). "The party seeking enforcement of a settlement agreement has the burden of establishing assent by the opposing party." *Id.* (citing *Williams v. Ingram,* 605 So. 2d 890, 893 (Fla. 1st DCA 1992)). "For a settlement agreement to be enforced, the agreement must be 'sufficiently specific and mutually agreeable on every essential agreement.'" *Id.* (citing *Don L. Tullis & Assocs. v. Benge,* 473 So. 2d 1384, 1386 (Fla. 1st DCA 1985)). To that end, uncertainty as to nonessential and ancillary terms will not prevent enforcement of a settlement. *See Carpaneda v. Quayside Place Partners, LLP,* 2010 WL 2696958, *2 (S.D. Fla. July 7, 2010) (citing *Spiegel v. H. Allen Holmes, Inc.,* 834 So. 2d 295, 297 (Fla. 4th DCA 2003)). As a general principle, "settlements are highly favored, and will be enforced whenever possible." *See Robbie,* 469 So. 2d at 1385.

In practice, "[e]xecution of the settlement agreement is not a condition precedent to a settlement agreement, but rather is merely a procedural formality." *Vital Pharmaceuticals,* 2007 WL 1655421 at *6 (citing *Boyko v. Ilardi,* 613 So. 2d 103, 104 (Fla. 3d DCA 1996)). "Rather, courts look to traditional notions of offer and acceptance, and basic contract law, to determine whether an enforceable contract exists." *Id.* (citing *Robbie,* 469 So. 2d at 1385). Essentially, courts should decide whether the parties "said the same thing as to the essential elements." *See Robbie,* 469 So. 2d at 1385.

With these considerations in mind, and after a review of the evidence, the undersigned believes that the terms contained in the March 6th email constitute an enforceable settlement for three reasons.

First, the Parties' Agreement incorporates all essential terms: Defendants would pay a sum of money, the Parties would enter into a license agreement with a definite royalty, duration, and scope, and all Parties would sign a full mutual release of claims in the underlying litigation. *See Sands v. Wagner and Hunt, P.A.*, 2009 WL 2730469, *3 (S.D. Fla. Aug. 28, 2009) (affirmed by Order adopting Report and Recommendation dated Sept. 16, 2009) (finding similar terms to constitute all of the "essential terms").

Second, D'Anna's unequivocal assent, "Agreed," objectively evidences an agreement not subject to conditions which would make the settlement unenforceable. *See American Appraisal Assoc., Inc. v. American Appraisals, Inc.*, 531 F. Supp. 2d 1353, 1358 (S.D. Fla. 2008) ("If an offer is accepted without conditions, and without varying its terms, and the acceptance is communicated to the other party without unreasonable delay, a contract arises from which neither party can withdraw at its pleasure.").

Third, the undersigned finds the proposed enforcement provisions to be an ancillary matter, analogous to the confidentiality provision that was not considered a material term in *Sands*. *See Sands v. Wagner and Hunt, P.A.*, 2009 WL 2730469, *3-4 (S.D. Fla. Aug. 28, 2009) (finding that a confidentiality provision proposed subsequent to unequivocal assent to settlement was an ancillary matter, and its exclusion from the agreement did not bar enforcement of the agreement) (citing *Murchison,* 13 F.3d at 1487 ("We favor and encourage settlements in order to conserve judicial resources. We cannot allow a litigant to attack the integrity of the settlement

process by attempting to recharacterize the focus of his litigation after he decides he is unhappy with the settlement."); *B.P. Products N.A., Inc. v. Oakridge at Winegard, Inc.,* 469 F. Supp. 2d 1128, 1139 (M.D. Fla. 2007) ("A litigant cannot permissibly attack a settlement simply because the relief that he apparently wanted and the relief to which he agreed were not the same."); *Lanza v. Damian Carpentry, Inc. et. al.,* 6 So. 3d 674, 675 (Fla. 1st DCA 2009) (rejecting attempt to repudiate a binding settlement agreement by raising ancillary issues after settlement had taken place)). After reviewing Plaintiff's email that seeks to restructure the agreement, it appears that the primary basis for repudiation is money; by March 21, Plaintiff is requesting an increase in the settlement amount and a decreased royalty under the license agreement (DE 44-6). Only as an aside does Plaintiff dispute the language of the draft license agreement (DE 44-6). In any event, Defendants indicated at the hearing that they would agree to any reasonable enforcement provisions proposed by Plaintiff (DE 56), thus further indicating that the absence of these provisions from the March 6th email should not preclude enforcement of the settlement agreement.

In sum, because "the parties have said the same thing as to the essential elements," the undersigned recommends that the March 6th settlement agreement be enforced. *See Robbie,* 469 So. 2d at 1385.

**Statute of Frauds**

As mentioned above, Plaintiff filed a Supplemental Response after filing his Response to Defendants' Motion, wherein he makes an argument under Florida's statute of frauds (DE 51). Specifically, Plaintiff asserts that the settlement agreement is invalid because the acceptance email was not signed by either Plaintiff or Mr. D'Anna. Because Plaintiff did not seek or obtain

leave of court before filing his Supplement as required by Local Rule 7.1(c), the undersigned is empowered to strike the supplement and disregard Plaintiff's argument. Nevertheless, the undersigned has considered the supplement and finds that Plaintiff's statute of frauds defense is without merit.

Florida's statute of frauds states that contracts that cannot be performed within one year are unenforceable unless "signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized." *See* Fla. Stat. § 725.01. "The purpose of the statute of frauds is to 'intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos.'" *See U.S. Distributors, Inc. v. Block*, 2009 WL 3295099, *5 (S.D. Fla. Oct. 13, 2009) (citing *Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779 (Fla. 1966)).

"Florida courts are flexible as to what kinds of documents satisfy the writing requirement, and Florida law provides that electronic signatures 'may be used to sign a writing and shall have the same force and effect as a written signature.'" *Id.* (citing Fla. Stat. § 668.004; Fla. Stat. § 668.003(4) ("'Electronic signature' means any letters, characters or symbols manifested by electronic or similar means, executed or adopted by a party with an intent to authenticate a writing. A writing is electronically signed if an electronic signature is logically associated with such writing.")). And most importantly here, "[f]or purposes of the statute of frauds, several writings, only one of which is signed [], may be aggregated to satisfy the statute provided that the signed writing expressly or implicitly refers to the unsigned document." *Cook v. Theme Park Ventures, Inc.,* 633 So. 2d 468, 471 (Fla. 5th DCA 1994) (citation omitted).

In this case, the undersigned believes that in the aggregate, the settlement-related emails attached to Plaintiff's Motion and the related documents, most of which are signed by Plaintiff's attorney, are sufficient to meet the writing requirement of the statute of frauds. As determined above, the March 6th email evidences the final settlement agreement to which both Parties agreed and are bound. But the March 6th email is only one email in a collection of emails evidencing the Parties' negotiations. The vast majority of these negotiation emails contain either Mr. D'Anna's electronic signature, his signature block, or both (DE 44-1, 52-1, 52-2, 52-4, 52-5, 52-6, 52-7, 52-8, 52-9, 52-11, and 52-19). Furthermore, D'Anna's March 21st email, in which D'Anna acknowledges and attempts to restructure the settlement agreement entered into on March 6th, is signed (DE 44-6).

Based on all of this evidence, and because no argument has been made to the contrary, there is no concern that the Plaintiff's act of acceptance is based on "loose verbal statements or mere innuendos." *See Block*, 2009 WL 3295099 at *5. Instead, the collection of emails evidences a concerted effort to resolve the case by negotiation with the sole purpose being to enter into a settlement agreement, which was sufficiently reduced to signed writings as to be enforceable.

## RECOMMENDATION TO THE DISTRICT COURT

Accordingly, this Court **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Enforce the Settlement (DE 44) as follows:

1). Find that the March 6th email constitutes a binding contract to which both parties must adhere;

2). **ORDER** Plaintiff and Defendants to complete and execute the final settlement documents, including the full mutual releases and licensing agreement contemplated in the March 6th email, by **Friday, May 2nd, 2014**;

3). **DISMISS this case with prejudice**, pursuant to the valid settlement; and

4). Retain jurisdiction to enforce the settlement agreement.


## NOTICE OF RIGHT TO OBJECT

Because Defendants have requested expedited resolution of their Motion, and the undersigned finds such request justified, this Court directs that any party shall serve and file any written objections to this Report and Recommendation with the Honorable Kenneth A. Marra, United States District Court Judge for the Southern District of Florida, within **three (3) days** of the issuance of the instant Report and Recommendation. *See* S.D. Fla. L.R., Magistrate Judge Rules, Rule 4(a)(1) (2013) (providing that a Magistrate Judge may prescribe a different time for objections). In the event that any party has no objection to this Court's Report and Recommendation, such party shall file a notice indicating such fact forthwith. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained

herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE and SUBMITTED** in Chambers this 21 day of April, 2014, at West Palm Beach in the Southern District of Florida.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:

Hon. Kenneth A. Marra, United States District Court Judge for the Southern District of Florida

Counsel of Record